Yes, I think it's appropriate for the appellant to have the opportunity to address it before the appellee does. All right, let's see what we need to talk about in connection with the next case. Right, so this is appeal number 2008, next appeal. No, we've argued the on-sale bar in the part of the... We've argued the on-sale bar. My perception, tell me if this is an oversimplification, is that in the AT&T case, since it seems conceded that they aren't infringing, that your cause against AT&T is limited to the trade secret issue. No, no. Is that inaccurate? We had much more on the AT&T case, a much greater number of things, and if I can address, if you prefer that we address that before I finish the consolidated appeal, I'd be pleased to do that. It would help to clear my mind just where the dividing line is. If the decision on validity goes one way or the other, I would think it wouldn't matter as far as AT&T is concerned, since they stopped whatever they were doing that you say they shouldn't have been doing before the patent issue. That's not correct. That's not correct. They stopped. They had a few thousand dollars of revenues after the patent issue, but it was not a lot. But, you know, they were indeed in it. And there was also an account for the misappropriation of the invention beginning in 1991 when Carl Interactive, the joint venture, began... That was my question, whether the misappropriation or the trade secret. That's part of the AT&T case. It was unique for AT&T and dispositive for AT&T. Well, I think it's dispositive, even if there was, well, I guess if there was an on-sale bar before that, then I would lose that as well. But if the on-sale bar doesn't carry the date, then I would be entitled to have a hearing on the misappropriation issue. I would like to address that. When you say entitled, that's now. This is it. Okay. All right. Let me address it in the AT&T case on the question of... The question was, did AT&T know about the invention in 1991? And we believe the answer to that is yes, because the Carl Interactive was a joint venture of AT&T and American Express. American Express cardholders would make inquiry about their accounts, their billing or whatever. Automated response system designed by AT&T was used by Carl Interactive. All of the equipment was AT&T, and they knew how to make these voice responses to say, if it's a billing inquiry, you route it this place, and if it's another kind of inquiry, you route it someplace else. All that was computer-driven, automated, and recorded voice responses. AT&T had to sign off on the contract with Paragon, Dr. Owen's company, because they paid $50,000 to be able to use it, and there was expenditures like that. Whenever there was any expenditures or anything, the joint venture had only worked for AT&T and American Express' customers. So they were able to go outside to third parties. They had to have a sign-off by the AT&T management as well as American Express management, and that's what took six months or five months to resolve. The contract that was agreed to with American Express is at A369, and I believe that's in Volume 1 of the AT&T agreements. It specifically defines what it was that Caller Interactive was going to do. As I say, AT&T signed off on this, so they knew what Paragraph 2 says. Paragraph 2, description of CI services. CI will develop software and hardware in order to provide the call processing to support the services Paragon provides to its customers. CI services will consist of the following defined as the service. A customer of Paragon wishing to place a call to a domestic or international phone will call a number which will terminate at the location of CI. Before going off hook, the software will strip the direct in-dial, DID, identifying information provided by the caller, search the database of Paragon customers provided and owned by Paragon, terminate the call, and immediately place an outbound call back to the identified telephone number, which will return to a non-busy state. The caller will be prompted to enter the telephone number the caller is requesting. An outbound call is placed by the audio response unit to the party requested, and both parties are bridged together. And that's what the claimed invention is in Paragraph 2A of the Call Interactive Agreement. So there was clearly knowledge of what this invention was back in April of 1991. And in the control of the claims, well I'm not going to spend time on the claims, but I represent that this is a recitation of what the claims call for. And I was going to refer to the drawing at 8211, but I'm not going to do that in the interest of time as well. But all the testimony says that this is how the invention works. We go fast forward. After the contract had been in effect for a matter of just a few months, Call Interactive gave notice of termination of the agreement. And there was a six-month period in order to terminate. So the contract was terminated in early 1992. And the reason it was terminated, according to the Thompson Declaration, was that AT&T didn't want Call Interactive to be in this business because they had wanted to have the entire concept of the international callback declared illegal. And AT&T petitioned to the FCC for a declaration that this international callback was wire fraud and theft of service. And the FCC listened to it and said, no, there's nothing wrong with that. It provides cheap services for subscribers. It's in the public interest. And so they denied the petition. And then after the petition was denied, AT&T said, well, if you can't fight them, join them. And so we're going to adopt this as our procedure. And they started to use the invention in 1996, before the patent issue. And the contract with Call Interactive, well, first I want to touch upon what AT&T did. They were given the patent application by Paragon, the patent application that had been filed in 1994 based on a 1992 application. And it had claims that are exactly the claims of the 964 patent. They had that in 1996. And they agreed to review it only on condition that Cygnus would agree to a confidential, not confidential, they would not keep it in confidence. They agreed that they would consider this, but if they used it, they would agree to sit down and confer about the compensation for the use of the invention of the patent application and try to reach a satisfactory agreement. And they looked at the patent application for three months and came back and said, we don't believe there's anything in there that's novel and of any present interest to AT&T. But if they weren't bound to confidentiality, how can you have a misappropriation claim and you're really stuck with your patent? And I gather it's not disputed that by the time the patent goes out... No, the misappropriation took place before that contract about non-confidentiality. They took place in 1991 when this contract that had the description of what the service was in the contract was in 1991, and that's confidential. It says on its face that this is a confidential agreement. So there was a breach of a confidential agreement when they adopted that invention in 1996. They adopted that invention before this agreement that says it has to be disclosed in confidence because they already had it. They received it in confidence. And so they can't say, oh well, because you agreed that we didn't have to keep it in confidence, the duty of confidentiality arises in 1991 in this contract that AT&T signed off on. So that's the point about that one. And they agreed that they would pay commissions on the use of the invention by Call Interactive for its own customers. AT&T adopted that agreement as its own when they began using the invention disclosed in this contract in 1996. And they used that invention for three years. The contract says that the duty to pay commissions survives termination. So even though they terminated the contract in 1992, the duty to pay commissions survived that termination and went on for the three year period commencing when the thousandth minute in any given month of the callback took place. And that happened in 1996 and went and endured until 1999. And so we say that they owe commissions for that three year period under the agreement that's A369. So that's the argument about that. But the really terrible thing was that they said we have no interest in this invention. And they said that in October of 1996, and in fact in August of 1996, they had announced that they were going to use international callback for their services. AT&T was going to use that. And Mr. Wood testified in the district court that what they were using was exactly the same technology, exactly the same technology in 1996 that was what became the patent was disclosed in the call interactive agreement. I have the impression that there are two different issues here. One has to do with statute of limitations on the misappropriation claim. The other has to do with your claim for commissions. Now on the first issue, it's my understanding from the appellees here, from AT&T, that you concede that all of the callback services at this time in 1996 used your system. Concede? That's the essence of our claim. Right. And that being the case, that there was no reason why the statute of limitation didn't run. No, no, it's told. It's told. We didn't know about it. We didn't know about it until Mr. Wood said it's exactly the same technology. Prior to that time, they'd always said, no, we don't know anything about it. We don't know anything about the international callback. The announcements didn't say how it worked. It didn't have what paragraph two of the contract says about bridging calls and all that sort of thing. We had no way of knowing it. When did you learn, and where in the record are we supposed to determine how you learned, that the other systems did not use, when did you learn that they did use your system? When Mr. Wood said in open court that it's exactly the same technology. That's the first that we knew about it. We were denied discovery. We sued them for misappropriation. The judge granted a motion for judgment on the pleadings. I said, you can't do that, Judge. As long as you're referring to these documents in 1996, you can't grant a judgment on the pleadings because that's not in the pleading. He said, well, it is in the pleadings. Then later on, AT&T filed a motion for summary judgment, which, again, goes beyond the pleadings. It goes into the record. At that point, it was clear that they were using the same invention because Mr. Wood said they were using the same invention. You have a tolling of the statute of limitations. If we had no way of knowing, we were denied all discovery. We couldn't find anything out from them. They refused to allow us to depose anybody because they said no. There was a judgment on the pleadings. That was only a motion. There was no judgment. There was a grant of a motion, but there was no judgment entered in. Where are we supposed to find this information in the record here? Well, I've covered it in my brief, the citations to the record. I'm satisfied that that's there if you want me to. You're saying that the date of the Wood declaration. It's not a declaration. It was a statement in court. The date of the Wood statement in court, that I will find the date. I'll give you that. That's 1110 is the number. That's K1110. In 2005. It's a statement made in January 21st, 2005. That was the first we had any knowledge that this was exactly the same technology. Prior to that time, in all their papers, they said, Oh, we steadfastly deny that we infringed. If we ever have to, we'll prove that we don't infringe. There was never anything until 1110 where it says it's exactly the same technology. It's exactly the same thing that was being used. So I believe that those are central. This was to say that they were using it, but we didn't know that. This is the first time we ever encountered that. And with regard to the commissions, they say that that claim wasn't before the district court. How are we supposed to know that? Well, the contract certainly was. Was there a count for breach of contract in your complaint? Yes. Yes. Oh, yes. Absolutely. Yes. And in this cross motion for summary judgment, was there a presentation to the district court about your claim? Yes. So in the filing that we're going to get here on summary judgment, we could also get a clarification of what was before the district court on the question of the commission. You have a nice big pile of paper to look at. Well, I think it would be helpful for both of you to send us what it seems we need that we don't have. I know that our rules as to what you can put in the appendix are quite rigorous and perhaps overly so in this case. And, you know, if things aren't referred to in the briefs, you're not allowed to include it in the appendix. So there's a lot more. This seems like a lot of paper, but there's even more. Now, Mr. Sutton, we've exhausted your time again. Let's hear from the other side, and we'll see if there are some loose ends for both of you that we need to pick up. Mr. Wood. Let me address the, I guess it's the trade secret claim. First of all, let me point out that the statement that was made in open court by myself was in reference to the claims having to do with the trade secret misappropriation and the patent claims that were asserted by Cygnus. They had nothing to do with what AT&T was in fact doing. It was a statement to the court in response to the court's inquiry about whether the claims of trade secret misappropriation involved the same subject matter as the claims of patent infringement. I didn't say that. I'd like to point out that the technology that's embodied in the patent is exactly the same technology that's the subject of the trade secret claim. It doesn't say the claims. It says technology embodied in the patent. I appreciate that perhaps these remarks were not thought through in advance, but it's quite a powerful statement. Well, except that it relates again to Cygnus' claim for trade secret misappropriation, not what AT&T did, and Cygnus' claim for patent infringement, not what AT&T was actually doing. But to make the point that the statute of limitations had run, wasn't that the reason for this statement that the technology is the same? The statement that that's the reason. Yeah, that's the reason. That was, I believe, the reason for the judge's inquiry. Why shouldn't the statute of limitations run because the two claims, and shouldn't I move on these together because the two claims are essentially arising out of the same technical subject matter, which I agreed with. But that has nothing to do with what AT&T was in fact doing at that point in time. What did you mean when you said it is exactly the same thing that was being used? That was being used by Cygnus in the patent and in their system in reference to what Cygnus was using, not what AT&T was using. After all, at that particular time, AT&T wasn't doing anything in this area, which goes back to the summary judgment motion on infringement, which was AT&T stopped doing international callback, whatever its character, December 31st of 1998. Right, but what about your argument that they knew all along that you were using the same technology, that all international callback services use the same technology? Well, I think that overstates it just a little bit. I think what we put before the court was their belief that most, if not all, of the technology had to use the technique that was the subject of their patent application. And it was that knowledge in conjunction with the knowledge that they had disclosed their patent application to AT&T in conjunction with the knowledge that AT&T had already decided to start providing international callback services, all known by Cygnus in 1996, that created an inquiry notice or put them on notice that they had a potential claim. And that's all that's required. There is no necessity for them to prove that AT&T was in fact doing it. AT&T at that time could have been doing something quite different. But that doesn't mean that their right to make a claim against AT&T didn't arise in 1996. I think it's telling what was... Because the court was really interested in this at the district court level, and this is a paraphrase, just to shorten it down. The court asked Mr. Sutton, to this effect, what is it you know now about defendant's possible misappropriation that you didn't know years ago? Mr. Sutton answered, there are no facts that I know now that I didn't know years ago. And then the court asked again, if you have enough now to file a claim, why didn't you have enough to file a claim or file a suit years ago? Mr. Sutton, and this is a quote, because I thought that relying on patent infringement would be an adequate remedy. And then he goes on to say, in response to the court question, why are you filing a suit now? And Mr. Sutton says, because the patent infringement claim has fallen apart. It wasn't that the trade secret claim could not have been brought in 1996. It certainly could have been. That six-year delay was too long, and the court properly dismissed it. And how are we to establish that they knew in 1996 that virtually all international callback systems, including the AT&T system, used the method disclosed in the patent? There is attached to the motion a document that, and I believe that's of Mr. Wyatt, and I'd have to take a moment to look through the record. Your motion to dismiss? That's our motion to dismiss. And it clearly says right there that Mr. Wyatt, who was the head of Paragon at the time, believed that all systems that were out there that had to do international callback would very likely, or words to that effect, have to use the system that had been invented and was the subject of patent application by Cygnus. What is the status of the breach of contract claim? Was it pleaded in the complaint? No, it was never pleaded. It was not in the complaint? It was not in the complaint. This is one of the things that is very puzzling. This case is taking on a bizarre character. It's as if we have four different cases here, not just two different cases. We can't even agree as to what's in the complaint? There was no breach of contract claim in the complaint? No. There was a trade secret misappropriation claim, there was an infringement claim, and there was a patent infringement claim. Three claims, that's all. What was the second one? There was the trade secret misappropriation claim, the infringement claim, and... Wasn't the misappropriation? I'm sorry? Wasn't the communication of what was misappropriated done under contract? Yeah, but it wasn't a contract with AT&T. It was a contract with Call Interactive. Call Interactive isn't even a party in this case. There were no claims for breach of contract, fraud, anything like that, that were alleged. Let's go back to the complaint and look. Any more questions? Anything else you need to tell us, Mr. Wood? I don't have anything further on those issues. Okay. Thank you. Mr. Sutton, you have some rebuttal time. I'm going to speak. I'm going to address only the issue of the DIT number, the claim construction issue. The district court held at A6, at line 17. However, CYGNSS overlooks the specification of the patents in suit, which explain that while a subscriber dials a seven- or ten-digit phone number sufficient to complete a call, the local exchange carrier passes along only the last four, sometimes five, numbers. And that's importing a limitation from the specification into the claims, and that's inappropriate and should not be done. But the more important thing is that it's a mistake of fact. The process, if I can refer to you. I think that aspect is pretty well explored. I'm sorry? I think that aspect is pretty well explored in the briefs. I think if you have anything in rebuttal. I want to address specifically why it's a statement of fact. Volume 1 of the Consolidated Appeals, at page 211, is the drawing of the patent. The drawings are the same in both patents, but I'm referring to page 211. And it says that the subscriber, which is number 10, the telephone in the foreign country that is the subscriber 10, dials his signed DID number. It goes to an inter-exchange carrier, which is between the international system to the United States system, which is box 14 and A211, and then it passes. This is the DID number passes to LEC 15, and then the DID number passes on line 16 to CRU Caller Response Unit 20, which is in the box called 12, which is the service provider in the system. And this shows that the DID number goes from 10 to 14 to 15 to 20. And that's what the drawings show. The patent claims talk about how the DID number has to be received by the service provider. And for that I refer to A220, column 10, at about line 16. It says the first telephone connection means is capable for receiving an incoming direct inward dial telephone number on the trunk line from the telephone exchange as part of the incoming call attempt. That means it's received. I should interrupt because I don't think this is appropriate rebuttal. I think that the briefs are fairly thorough. I think that there are larger questions that we're going to have to confront. I guess I have talked about the testimony, the claims, the drawings, the specification, Dr. Forry's testimony. Well, this is really now your rebuttal. I'll concede that's wrong. And I believe that the DID number is the same throughout. It's used by every defendant. They call them DID numbers. And they're saying that what they have doesn't have four or five digits. And I think the record is clear that a DID number always has to have an area code, an exchange prefix, and a four-digit line number, just like every other telephone number. Okay. Well, I think the case is taken under signature. I have one question about the motion to strike. Who are you going to ask? Mr. Sutton. Okay, Mr. Sutton, we have a question for you. Mr. Mardula hasn't had an opportunity to argue at this point. No, we didn't get to him. We have another question. On the motion to strike, AT&T's, I think it's AT&T's motion to strike, several of the items that were pertinent to the motion to strike, you know what I'm talking about. Yes. Right. Relate to materials that are assertedly in the May 4th, 2007, declaration of your declaration. I'm sorry. Okay. All right. Well, this may not be something you can answer off the top of your head. May of 2007? Right. You had a declaration dated May 4, 2007, which contained some exhibits. Yes. And they are moving to strike various matters that you assert were attached to that exhibit. Right. To that declaration. I do recall that. Okay. Now, you're representing, for example, the Gunther 2002 declaration was This may be just taxing your memory unfairly. Gunther was definitely involved at every stage of this proceeding. To say that Gunther was not. Well, what I'm really trying to get at right now is there's a dispute between the parties as to what was attached to that declaration, and I want to make sure that Gunther, which they moved to strike, was in fact included as an attachment to that declaration. You say yes. I do, Your Honor. Okay. We're going to provide the record so you can verify. Okay. But this is not something that would be part of the record of the summary judgment proceeding, I don't think. Is it? The May 2007 declaration of Sutton? Well, the motion to strike was considered in the November 21st hearing. This is the motion to strike here. Oh, I see. I'm sorry. There was a flurry of filings. We have a folder full of motions between the parties. I'm confused. I understand. Okay. So you would like to have the declaration that I filed in opposition to their motion to strike? Well, the declaration, and I'm not sure what this declaration was filed in response to because there was a little confusion in the district court as to exactly what your May 2007 declaration was responding to. But to the extent that it was, well, whatever it was responding to, it either did or didn't. Did, according to you, didn't, according to them, contain a number of attachments. The whole question is, was any of this stuff before the district court? And one of them is Gunther, Exhibit 482. Another is Ailman Excerpts from the September 8, 2006 deposition. That's the Ailman? Ailman. Dr. Ailman's? Mm-hmm. Ailman. Another is the Thompson deposition, which was referenced at paragraph 10 of that. And the fourth one was the 1131 declaration of Ailman, which was, I'm sorry, that is not in the, just those three, those three items. All right, well. It would be helpful to us in responding to the motion to strike to know for sure what was attached to the May 4, 2007 declaration. If, assuming that AT&T's position is still that none of those things were attached to that declaration. Well, I think Mr. Wood has conceded in the AT&T case that the contract was the October 15, 1990 contract. He has conceded that with respect to the contract. He has not, if I understand him correctly and we can find out, conceded with respect to the three items that I just referred to. Well, I think that's been ruled upon by Judge Rader. There were two motions to strike. One was by AT&T. And Judge Rader decided that and issued an order that presumably has been referred to the merits panel for consideration. A second motion was filed by Mr. Carey, his firm, in the consolidated appeal to strike. This is the same, virtually the same documents. That was referred to the merits panel for a decision. So as far as the AT&T decision is made, I believe that's been decided by Judge Rader. Well, it was referred to us, and I think that we're seeking some time as well. Maybe, I'll be happy to provide you with whatever... Well, there may not be any disagreement. Perhaps Mr. Wood doesn't disagree with you that those three documents were attached to the May 2007 declaration. Do you know what I'm referencing? Your Honor, I know what you're referencing, but frankly, I'd have to go back and look at the documents. I don't. Well, I think if the two of you can resolve it without turning it into a federal case... Well, I think it's been decided. Well, it was referred to the merits panel. That's us. No, no. The Judge Rader's decision. Judge Rader's was... He talked about how the appellees don't understand what's in the record. If AT&T took a deposition of Thompson, AT&T took a deposition of Allman, those are in the record. Those are in the record. And so, you know, whether it's the fact that certain pages were referred to only by AT&T and certain other pages weren't included, but it's another matter. But to say that you strike it because it wasn't in the record I submit doesn't follow. It's a non sequitur. If it looks as if we need more, we'll have to be back in touch. Would Your Honor like additional briefing of any issues? If so, we will ask you. I think at the moment we'll be content with the portions of the record and the summary judgment materials that we've talked about so far. Your Honor, can I just point out one record? Approach the podium. Is that being picked up on your microphone, those comments? Yes, I'm sorry, Your Honor. This is A1333, which is the second amendment complaint. A1333? A1333. Okay. Okay. Anything else we should ask? Any more questions at the podium? All right. Thank you all. The case is taken under submission. All rise.